COURT OF APPEALS OF VIRGINIA


Present:  Judges Coleman, Willis and Bumgardner
Argued at Richmond, Virginia


GEORGE C. HOWELL, III

                                          OPINION BY
v.   Record No. 2800-98-2      JUDGE RUDOLPH BUMGARDNER, III
                                       JANUARY 27, 2000
MARGARET H. HOWELL


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Theodore J. Markow, Judge

            Ronald S. Evans (Lawrence D. Diehl; Brenner,
            Dohnal, Evans & Yoffy, P.C., on briefs), for
            appellant.

            James C. Roberts (Dawn B. DeBoer; Mays &
            Valentine, L.L.P., on brief), for appellee.


     George C. Howell, III appeals from the final decree

divorcing Margaret H. Howell and him and distributing their

marital estate.  He complains primarily that the trial court

erred in valuing his interest in his law firm, but he also

asserts it erred in classifying a money market account, in

allocating marital debt, and in setting spousal support.  The

trial court referred all issues to a commissioner in chancery

and adopted nearly all of the commissioner's findings in its

final decree.  Concluding that the trial court did not err, we

affirm.

     The parties married in 1982 after the husband graduated

from law school but before he began practicing law with Hunton &

Williams, a large firm based in Richmond. The husband specialized in tax law, established a successful practice with the firm, became a partner in 1989, and earned an income of more than $400,000 by 1998. After the first of their two children was born in 1984, the wife no longer worked outside the home. She took care of their two children and maintained the household. When the parties separated November 17, 1995, she maintained custody of the children, and when they divorced November 4, 1998, she received sole physical custody of the children with the husband's consent.

The husband conceded that his partnership interest was marital property because he acquired it during the marriage. The partnership agreement at Hunton & Williams defined the value of the partnership interest upon termination or death. It entitled the partner to receive only the balance of his capital account and his share of the net income. As applied to this case, those two items amounted to $85,614. The husband maintains that the agreement fixed the value of his partnership interest for equitable distribution purposes and that it precluded consideration of whether his interest had goodwill. He argues that Kaufman v. Kaufman, 7 Va. App. 488, 375 S.E.2d 374 (1988), ruled that restrictive agreements control the valuation of business interests and limit the value to that established by the agreement. The husband argues that the trial court erred in finding that his partnership interest had

goodwill because the Hunton & Williams agreement made no provision for goodwill.

Code § 20-107.3(A) directs that the trial court value all property of the parties, but it does not define the term, "value," for equitable distribution purposes. The statute does not set the standard of value, that is, the measure of property's worth for equitable distribution. "Value" is a mercurial term; the term has numerous, distinct meanings. The various meanings are not interchangeable. The meaning of the term, "value," depends on what is being valued, who is interested, and why it is being valued. A piece of property may have different values for different purposes. The purpose for which it is being valued determines which definition, which standard of value, is proper. Purpose determines the standard of value; that, in turn, determines the appropriate methods of valuation.

Bosserman v. Bosserman, 9 Va. App. 1, 384 S.E.2d 104 (1989), defined "value" for equitable distribution purposes; it set intrinsic value as the standard of value. "Trial courts valuing marital property for the purpose of making a monetary award must determine from the evidence that value which represents the property's intrinsic worth to the parties . . . ." Id. at 6, 384 S.E.2d at 107. The value of an item of marital property is its intrinsic worth to the parties: the

worth to the husband and wife, the parties; the value to the marital partnership that the court is dissolving.

Intrinsic value is a very subjective concept that looks to the worth of the property to the parties. The methods of valuation must take into consideration the parties themselves and the different situations in which they exist. The item may have no established market value, and neither party may contemplate selling the item; indeed, sale may be restricted or forbidden. Commonly, one party will continue to enjoy the benefits of the property while the other must relinquish all future benefits. Still, its intrinsic value must be translated into a monetary amount. The parties must rely on accepted methods of valuation, but the particular method of valuing and the precise application of that method to the singular facts of the case must vary with the myriad situations that exist among married couples.

Because intrinsic value must depend on the facts of the case, we give great weight to the findings of the trial court. We affirm if the evidence supports the findings and if the trial court finds a reasonable evaluation based on proven methodology and on the application of it to the particular facts of the case. See Russell v. Russell, 11 Va. App. 411, 415-16, 399 S.E.2d 166, 168 (1990). "[T]he trial court's valuation of goodwill will not be disturbed if it appears that the court made a reasonable approximation of the goodwill value, if any, of the

professional practice based on competent evidence and the use of a sound method supported by that evidence." Id. at 417, 399 S.E.2d at 169 (citation omitted).

In Kaufman, the husband purchased a one-third interest in a medical practice six months after the parties separated. The purchase contract required stockholders to resell their interest to the corporation at a value excluding any provision for accounts receivable or work in progress. The trial court held that the value set by the contract controlled because the terms were made at arm's length and were devoid of fraud. This Court affirmed that valuation and ruled it was bound by the finding because there was evidence to support it. See 7 Va. App. at 502, 375 S.E.2d at 381 (citing Code § 8.01-680).

In Bosserman, the wife asked the court to value the husband's interest in a family-owned, closely-held corporation. A restrictive agreement required a shareholder to offer the stock first to the corporation at "true book value." The husband argued that the restriction defined the value. See 9 Va. App. at 3, 384 S.E.2d at 106. This Court recognized that the value set by such agreements "is often artificial and does not always reflect true value," even though the agreements may be binding on business partners. Id. at 6, 384 S.E.2d at 108. "[T]he sale price set by restrictive provisions on transfer is not conclusive as to the value of the stock." Id. at 7, 384 S.E.2d at 108. A restriction on transfer does not control its

value, "but the restriction on transfer is a factor which affects the value of the stock for purposes of equitable distribution." Id. (citations omitted). Interestingly, Bosserman relied upon an article discussing goodwill valuation in law firms to conclude restrictive provisions are not conclusive of value.

Russell established that a psychiatric practice could have goodwill that had value. "[I]f the trial court determines from the greater weight of the evidence that a professional practice has goodwill value, that amount must be subject to valuation as part of the marital property. To hold otherwise would result in a windfall to the professional spouse." 11 Va. App. at 416, 399 S.E.2d 168. Goodwill may be an asset of a professional practice, and if it is, it is subject to valuation for equitable distribution purposes.

All three decisions turned upon the particular findings made from the precise evidence presented to the trial court. The holdings establish that the value of property is an issue of fact, not of law. Goodwill may exist, or may not; an agreement may restrict its value, or may not. The existence of goodwill must be proven, and if it exists, its value must be proven. The evidence presented at trial determines the result, and the result may vary from case to case as the evidence differs. If conflicting, competent evidence is presented, that found more credible will determine whether goodwill exists and its value if

it does exist.  The existence is not fixed as a matter of law, nor is the method of valuation; both are functions of the fact finding process.

In this case, the commissioner found that the husband's partnership interest had intangible value, goodwill, and that the partnership agreement did not reflect its true worth to the parties, its intrinsic value.  After hearing extensive expert testimony, the commissioner accepted the opinion of the wife's expert and valued the partnership interest at $319,569.  The trial court accepted the commissioner's findings.

The wife's certified public accountant testified that the husband's interest in his law firm had value in the nature of goodwill.  The husband's expert witness, also a certified public accountant, disagreed and testified that the partnership agreement controlled.  Both opinions were made by qualified and experienced experts, were reasoned and based on accepted principles, and either might have been found credible by the trial court.  In resolving the conflicting opinions, the commissioner gave greater weight to the wife's expert, and the trial court accepted that finding.

The trial court has discretion to resolve conflicting expert testimony to determine an asset's value.  See Rowe v. Rowe, 24 Va. App. 123, 140, 480 S.E.2d 760, 768 (1997); McDavid v. McDavid, 19 Va. App. 406, 413, 451 S.E.2d 713, 718 (1994). Where the court accepts the commissioner's findings of fact,

"the findings are presumed to be correct when reviewed on appeal and are to be given 'great weight' by this Court." Rowe, 24 Va. App. at 140, 480 S.E.2d at 768 (citation omitted). The court's decision will not be disturbed on appeal unless plainly wrong or without evidence to support it. See Blank v. Blank, 10 Va. App. 1, 9, 389 S.E.2d 723, 727 (1990).

The standard of value has a critical impact on the effect of a restrictive agreement. The standard in equitable distribution, intrinsic value, looks to the value to the parties to the divorce action. When the parties do not contemplate sale and one of the two is going to enjoy the benefits of the property with no likelihood of leaving the business, a restrictive agreement may have less bearing on the value to the parties. The agreement should be considered but it is not conclusive. "The reason for rejecting the value set by buyout provisions is that they do not necessarily represent the intrinsic worth of the stock to the parties." Bosserman, 9 Va. App. at 6, 384 S.E.2d at 107.

The commissioner considered the restrictive agreement as one factor in determining whether goodwill existed, but he did not find it to be the sole, controlling factor. Credible evidence supported the finding that the partnership agreement was but one factor to consider in determining the intrinsic value of the husband's partnership interest. The trial court did not err in finding that the Hunton & Williams partnership

agreement did not control the existence of goodwill in the husband's interest in the firm.

The husband contends that even if the trial court did not err in rejecting the partnership agreement valuation, it did err in the method and application used to value the interest. Both sides presented expert testimony valuing the goodwill of the partnership interest. The commissioner found that the wife's expert was persuasive and accepted his evaluation. The trial court affirmed those findings fixing the value at $319,569.

The wife's expert used the excess earnings method to value the practice goodwill, a method acknowledged by the husband's expert as the most popular method for evaluating professional goodwill. The wife's expert began by comparing the husband's average income for three years to that of a peer group. The difference between the two was the excess earnings due to the husband's association with the firm, but not the earnings due to his personal efforts. It was the additional income he received from being associated with his law firm. The wife's expert projected those excess earnings over the husband's expected career with Hunton & Williams. Using the discounted future earnings method, he then calculated the present value of the husband's total future excess earnings.

The wife's expert began by comparing the husband's earnings to those of a peer group. The husband argues that this method, described as working from the "bottom up," is incorrect. He

contends that the peer group selected by the wife's expert compared him to merely average attorneys, did not reflect his special reputation and expertise, and failed to distinguish his personal credentials from those of Hunton & Williams. He also contends that the discounted future earnings method is an improper method of valuation because it is based on future earnings projections. Finally, he argues he can have no excess earnings due to his association with Hunton & Williams because he had received offers from other firms for 150-175% more income.

The wife's expert carefully explained why he selected the methodology that he used. A major reason was the unavailability of partnership financial data. Before getting the appraisal, the wife attempted to discover the partnership's financial records. Hunton & Williams successfully had the request quashed and did not make any partnership financial data available. The wife's expert felt the "bottom up" method was more accurate under those circumstances. The trial court accepted that opinion and analysis. We cannot say that the opinion was unworthy of belief as a matter of law.

The wife's expert selected the husband's peer group based on factors that included comparable geographic location, population, firm size, specialization, and years of practice. The husband argued that the group did not reflect his special talents and that the appropriate peer group was the one selected

by his expert. The trial court carefully examined these conflicting opinions and rejected the one offered by the husband. The trial court found the peer group suggested by the husband's expert was flawed because the group only included firms located in very large cities, such as New York or San Francisco, and it was a selection provided by the husband.

The wife's expert valued the husband's excess earnings due solely to his association with his firm at $38,269. He then projected this figure to the husband's expected retirement year, 2021. After adding the terminal value of the husband's capital account, he applied a discount rate of 6.9%. The result was the present value of the husband's partnership interest, $319,569. The court accepted the wife's expert's use of a discount rate of only 6.9%. The expert justified that rate, one applicable to nearly risk-free investments, and the record does not suggest that it was incredible. As presented, the proper discount rate was an expert opinion that could be accepted if the trier of fact found it persuasive and believable.

Discounting future earnings is not an inherently flawed method of valuation because it is based on projected future earnings. The value of goodwill can have two components. Professional goodwill (also designated as individual, personal, or separate goodwill) is attributable to the individual and is categorized as separate property in a divorce action. Practice goodwill (also designated as business or commercial goodwill) is

attributable to the business entity, the professional firm, and may be marital property. The commissioner and the trial court carefully distinguished between these two components and selected a value that was solely attributable to the husband being a partner in Hunton & Williams. It represented the premium due to the husband's association with Hunton & Williams, the economic advantage he enjoyed because he was a partner in that firm. It included no value attributable to him personally, and it did not rely upon any earnings due to the husband's own expertise, reputation, experience, skill, knowledge, or personality. As applied, the discounted future earnings method was not a flawed method of valuation.

In valuing the goodwill of the partnership interest, courts must take special care not to confuse the owner spouse's personal future earning capacity with practice goodwill attributable to the law firm in order to avoid double counting. "Further, particular care must be given that future earnings capacity and reputation not be confused with professional goodwill." Russell, 11 Va. App. at 417, 399 S.E.2d at 168.

Though the husband's expert first stated that in his opinion the partnership interest could have no goodwill value, he offered an alternative opinion that recognized the husband's interest did have goodwill value. The trial court found that the alternative opinions offered by the husband, that his interest did and did not have goodwill value, were contradictory

and confusing. The husband's expert used the capitalized historic earning method. His method required comparison of earnings to those of a peer group. The trial court found the husband's peer group inherently flawed, and it noted the group data was for the wrong year and compared group data to a single year of the husband's income.

The husband's expert calculated the value of a theoretical, marketable, controlling partnership interest in Hunton & Williams. To that figure, the expert applied a discount of 40% for lack of marketability and 30% for minority status. That reduced the market value of the husband's interest to $105,177. The trial court rejected the husband's reasoning for discounting for minority status and marketability. It found the discounts inappropriate because no transfer of the partnership interest was foreseeable and no one in the firm, nor any group within it, exercised majority control. See Bosserman, 9 Va. App. at 7-9, 384 S.E.2d at 108-09 (discussing restriction on marketability and minority shareholder status as affecting value to owning spouse). The trial court also rejected the argument that offers of employment at substantially higher compensation meant all goodwill was personal. The trial court would not accept the conclusion, suggested by that argument, that Hunton & Williams had no practice goodwill.

The experts disagreed on which of two accepted methods of valuation to use and on the application of those methods. They

differed on the following:  whether to value the individual interest first; whether to capitalize historic earnings or to discount future earnings; the proper peer group; the proper income data; and the application of discounts.  The opinions of the experts conflicted, but neither was erroneous as a matter of law.  "Depending on the circumstance of each case, different methods of valuation may reflect more accurately the actual value of the stock to the shareholder."  Id. at 7, 384 S.E.2d at 108.  No single method for determining the value of professional goodwill is preferred.  See Russell, 11 Va. App. at 417, 399 S.E.2d at 169.  We conclude that the trial court did not err in selecting the method of valuation or in the application of it to the facts presented in this case.  The wife's valuation of the husband's interest in his law firm was supported by substantial and competent evidence.

The husband argues that the trial court erred in classifying a portion of a $203,288.46 money market account as marital property.  The trial court designated $38,355 of the fund as marital property and $164,933 as the husband's separate property.  The husband established the account in his name alone after the parties separated.  He made the first deposit in March 1996 when he received his annual partnership earnings distribution.

Hunton & Williams operated on a fiscal year that ended in March, and it paid the partners the balance of their earnings in

March of each year.  The husband had to report his entire partnership income on his individual tax return for the calendar year in which the fiscal year ended.  For example, he had to report all income earned from April 1, 1995 to March 31, 1996 on his individual income tax return for the calendar year 1996.  That would throw nine months' worth of earnings, the portion earned in 1995, into the next individual income tax year, 1996.

The receipt of annual earnings in a lump at the end of the partnership's fiscal year created an irregular cash flow.  The couple's income trailed their expenditure of it.  To balance expenditures with receipts of income, the parties borrowed temporarily.  They established an equity line of credit when they first purchased the marital home.  Throughout the marriage, they had used that as a source of funds to pay expenses that came due before the partnership distributed its earnings.  When they received the distribution at the end of the fiscal year, they would pay the credit line down.  They used the distribution to repay the temporary financing incurred over the preceding twelve months.

At the time the parties separated, the balance due on the equity line was $126,801.  The husband borrowed an additional $70,000 after the separation, but the wife froze the account when she learned of these draws.  He then borrowed on two additional accounts and used the proceeds to pay taxes and tuition.  The husband claimed that the funds borrowed after

separation were used for marital purposes. From July 1995 the husband only paid interest on the equity line account, and after separation, he did not curtail the account except to apply $71,652.71 from the portion of the March 1996 distribution that he considered to be marital property.

The fiscal year-end distribution that husband received in March 1996 was for work done both before and after the date of separation, November 1995. The husband calculated that $72,795 was marital property. He applied $71,652.71 of that to the balance due on the equity line of credit. The remaining portion of the March 1996 distribution became the initial deposit to his new separate money market account. In June 1996, he received a $50,000 bonus that also represented work done before and after the separation. The husband calculated that $31,350 of that bonus was earned before separation and thus was marital property. He applied $27,000 of the marital portion toward payment of his 1996 estimated income tax and the balance to what he claimed were joint expenses. He deposited the portion that he considered separate property, $18,470, to his separate money market account.

The trial court classified $38,355 of the money market fund as marital property because it disallowed as marital expenses the estimated tax payment of $27,000 and $11,355 claimed as expenses for maintaining the marital residence. The husband argues that the use of his separate money market fund to make

the wife whole is inappropriate.  The husband contends these funds paid taxes, tuition, and household expenses of the marital residence.  He argues that the marital share of the June 1996 bonus paid the joint 1996 tax liability and not simply the taxes due on the bonus.

The trial court disallowed $38,355 of his claimed marital expenditures finding that the payment of $27,000 toward estimated 1996 taxes was not reasonable and that $11,355 of household expenses were not adequately proven.  The court held that the use of a substantial portion of the marital share of the June 1996 bonus to pay taxes under the guise of a joint obligation was not a valid marital purpose.  The court also held the husband's evidence was insufficient to satisfy his burden to prove that the expenditures of $11,355 were for valid marital purposes.  The husband did not provide a detailed explanation of these expenses, but the trial court still found that $54,955 was expended for marital purposes.

The husband had the burden to establish by a preponderance of the evidence that post-separation withdrawals of marital funds were used for a legitimate marital purpose.  See Alphin v. Alphin, 15 Va. App. 395, 402, 424 S.E.2d 572, 576 (1992) (court satisfied that husband's expenses, for which detailed accounting was provided, were for valid marital purpose); Amburn v. Amburn, 13 Va. App. 661, 666-67, 414 S.E.2d 847, 850-51 (1992) (wife did not squander away marital funds by paying for living expenses

husband failed to pay).  We conclude that the decision to classify a portion of the money market account to make up for the husband's non-legitimate marital expenditures was supported by the evidence and not plainly wrong when considering the way the parties normally managed their finances and used the credit line in tandem with their income.

The trial court ordered the husband to pay the balance due on the equity line loan, on two additional bank loans, and on a credit card account used by the wife.  The equity line balance was $122,129.50.  The husband incurred the two loans of $54,344.75 and $22,461 after the separation to pay tuition and estimated taxes.  The wife possessed only one major credit card after the separation, but the husband stopped paying the balance, began paying only the required minimum, and reduced the limit to $2,500.  The balance on the account was $2,191.  The husband contends that the trial court erred in allocating the entire marital debt to him.

Throughout the marriage the parties used the equity credit line as a source of available funds until they received the partnership income distribution.  After the separation, the husband stopped using his income to pay recurring family expenses.  He prorated receipts, and he segregated the portion he designated as separate property into the money market account where it accumulated as a separate asset.  He paid marital expenses or debts incurred to pay such expenses with the portion

he designated as marital property. The husband used the date of separation to divert arbitrarily his income from its established allocation to reducing debt incurred over the previous year for ordinary living expenses. The husband's action of not reducing the equity line permitted the joint debt to rise while he diverted the offsetting income to accumulate as his separate asset. This turned marital expenses into marital liabilities of the couple and reduced the marital wealth available for distribution. At the same time, any income earned after separation was diverted and not available for continuing family obligations. The combined effect permitted the husband to decrease the marital estate while increasing his personal estate, to distort their financial condition to his advantage.

The trial court recognized the distorting effect upon obtaining a correct understanding of the marital debts of the parties. The trial court found that the equity line and credit card account were marital debts and found the other two debts, while incurred for marital expenses, would not have been incurred under normal circumstances. It allocated payment of all the debts, with the exception of the first deed of trust, to the husband. The court carefully noted that wife could not receive a double benefit from the equity in the home increasing if the husband paid that debt because it excluded the equity line debt from the calculation of the value of the marital residence. The trial court allocated the marital debt to the

husband because the debt would never have been incurred if the cycle of incurring and discharging debt, established during the marriage, had been allowed to complete its final circuit.

Code § 20-107.3(E) empowers trial courts to distribute marital debt. Because making an equitable distribution award is often a difficult task, "'we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case.'" Moran v. Moran, 29 Va. App. 408, 417, 512 S.E.2d 834, 838 (1999) (distribution of marital debt) (quoting Klein v. Klein, 11 Va. App. 155, 161, 396 S.E.2d 866, 870 (1990)). Absent an abuse of discretion, "the trial judge's determination will not be reversed on appeal." Id.

The allocation of the debt to the husband is proper given the manner in which this couple managed their finances. To prevent an inequity, the trial court properly ordered the husband to pay the debt, and it considered all the statutory factors of Code § 20-107.3. We find no abuse of discretion.

Finally, we consider the court's award of spousal support to the wife. The court ordered the husband to pay $7,500 per month in spousal support and awarded child support of $2,181 based on the statutory guidelines. On appeal, he claims the wife's expenses include some non-recurring expenses; the wife's award should be reduced by the payment on the first deed of trust; and that some expenses, such as mortgage payment,

automobile, utilities, and household expenses, should be reduced by two-thirds because they include expenses factored into the child support guidelines.

The wife had no independent source of income. She submitted two exhibits to substantiate her claim for spousal support. One listed her average monthly expenses during the marriage ($8,746.92), and the other listed post-separation expenses ($8,013.76). She also presented two exhibits showing the corresponding child expenses of $3,017.23 and of $3,116.07. The wife's post-separation expenses included non-recurring expenses for legal bills and car rental which the court excluded from the support award. The court declined to reduce the support award by the amount of the mortgage payment because it found that the wife was entitled to a reasonable housing allowance and, when taxes on the support award were considered, she would not have sufficient funds to cover her monthly expenses. The court also found the husband's request to reduce the wife's living expenses by two-thirds unreasonable in view of her demonstrable needs. If so reduced, the wife would not be able to meet her demonstrated financial needs, and the support award would leave her below the standard of living to which she was accustomed during the marriage.

The husband cites Rein v. Rein, Record No. 1120-93-1 (unpublished, Va. Ct. App. Nov. 29, 1994), as authority for reducing these items. However, that case did not mandate such a

reduction. At most it directed that the trial court consider whether there might have been double consideration of items such as housing and utilities.

The husband is obligated to maintain the wife, within the limits of his ability to pay, "according to the station in life in which [she] was accustomed during the marriage." Gamble v. Gamble, 14 Va. App. 558, 574, 421 S.E.2d 635, 644 (1992). A spousal support award is subject to the trial court's discretion and will not be disturbed on appeal unless plainly wrong or without evidence to support it. See Moreno v. Moreno, 24 Va. App. 190, 194-95, 480 S.E.2d 792, 794 (1997). Based on all the evidence and appropriate factors, we conclude that the record supports the spousal support award of $7,500 per month.

For the foregoing reasons, we affirm the trial court's ruling.

Affirmed.