## CIRCUIT COURT OF ISLE OF WIGHT COUNTY

Erma C. Stephenson

v.

Willard R. Stephenson

April 3, 2002

Case No. (Chancery) 97-51

BY JUDGE D. ARTHUR KELSEY

In this divorce case, Erma C. Stephenson objects to two aspects of the Commissioner in Chancery's recommendations to the Court on the issue of equitable distribution. First, she claims the Commissioner correctly found that her husband's improper relationship with another woman ended the marriage, but then incorrectly dismissed the point as irrelevant given the lack of any monetary impact of that relationship on the marital estate. Second, she contends the Commissioner erred by applying a thirty-percent discount (for

lack of marketability and minority status) to the value of the couple's marital interest in a closely held corporation. For the following reasons, the Court agrees with Erma Stephenson and sustains her objections on both grounds.[1]

## I. *Background*

Erma Stephenson filed for divorce alleging that her husband "has been and continues to be guilty of adultery with one Marie S. Watson." Bill of Complaint 7, at 2. Willard Stephenson denied the allegation in his responsive pleading and claimed, among other things, that his wife falsely "accused" him of "having an extramarital affair" as well as harassed him emotionally and physically. *See* Answer and Cross-Bill § 3-4, at 2. Both the husband and wife sought a court-ordered distribution of their marital assets. After an extended period of time devoted to discovery, the parties filed a joint request to refer various equitable distribution issues to a commissioner in chancery to "take testimony" and report his "findings and recommendations" to the Court. *See* Decree of Reference (May 10, 2000). The Commissioner heard evidence and filed his report with the Court. *See* Report of Commissioner in Chancery (Oct. 22, 2001).

At the Commissioner's hearing, the parties presented evidence on various topics including the marital fault and stock valuation issues. The testimony established that the Stephensons married in 1960. They raised two children, a son and daughter, in Isle of Wight County, Virginia. They lived in the same home for over thirty years. *See* Hearing Transcript at 113-14. Willard Stephenson (who goes by the nickname "Tad") worked at R. L. Stephenson Realty, Inc., a closely held company owned half by his brother and half by himself and Erma Stephenson.

## A. *The Marital Fault Issue*

In 1995, Tad's son and daughter confronted their father with their suspicions that he was having an affair with Marie Watson, a secretary at the real estate company. *Id*. at 96-97.[2] Their father denied it, despite the curious circumstances the children pointed out to him. *Id*. at 97-98. Not long after that,

---

[1] Lawrence D. Diehl and Deronda M. Short represent Erma C. Stephenson. William H. Riddick, III, represents Williard R. Stephenson.

[2] At the Commissioner's hearing, Tad Stephenson bristled at the "secretary" title being applied to Watson, claiming it involves a "play on words." *Id*. at 145. He referred to her as a "helper at the office." *Id*. Watson, however, considered herself a "secretary" and did not find that characterization to be a semantic game. *See* De Bene Esse Deposition at 50 (Complainant's Exhibit 5).

the children noticed that their father was going on various out-of-town trips with Watson. In 1996, Tad invited Watson to accompany him on a personal trip to Alabama to visit a friend. *Id.* at 133. Again they challenged their father on this, and again he denied any improprieties. *Id.* at 98-101.[3] When their mother, Erma Stephenson, learned of these trips, she became "very upset" and "very depressed." *Id.* at 100, 108. After the Alabama trip with Watson, Tad thereafter declined any further sexual relationship with his wife. *Id.* at 439. When Erma visited her son, "she would always be crying, upset over the situation." *Id.* at 105. "She wasn't the same person that she was prior to the incident." *Id.* She became "very withdrawn over it" and would cry "all the time." *Id.* To her son, she confided that "she loved [Tad] but couldn't believe that he would do that to her." *Id.* Erma explained her feelings this way:

> Well, you find out the guy that you've gone to school with and you've loved all your life, that all of a sudden he has got another woman and you know it to be real this time and it's devastating. I cried. I didn't sleep. I lost weight. I couldn't eat. We had always done everything together and all of a sudden I was left by myself.

*Id.* at 413. Over the course of two years, Erma sought help from a counselor, therapist, and a medical doctor. *Id.* at 413-14, 108. Their son, Timothy, again pressed his father for answers. Tad continued his denial, but nevertheless made clear to his son that "he had lived his life for everybody else up to this point but now he was going to start living his life for himself." *Id.* at 101.

The bookkeeper at the realty company also observed what was going on between Tad Stephenson and Marie Watson. Tad took her out to eat "when she was supposed to be working" and was "obsessed with taking care of her and seeing that she was taken care of and doing more for her." *Id.* at 35. Tad used the company cell phone to call Watson a "tremendous amount." *Id.* at 36. Indeed, Tad made "hundreds" of calls to Watson during this period, some as early as 5:00 a.m. and some later than 10:00 p.m. *Id.* at 173-75. One such call occurred when Tad, his wife, and daughter were on vacation at Disney World. *Id.* at 176-77. He was not calling about work; he simply called "just to visit." *Id.* at 177.

---

[3] Tad's son, Timothy Stephenson, asked his father about this liaison with Watson. His father replied that it was an unplanned "coincidence" he and Watson "stayed at the same house for three days and came back on the same plane." *Id.* at 102. When asked about this testimony, Tad claimed his son was evidently "lying about that." *Id.* at 139.

In 1995 and 1996, Tad billed the corporate credit card for charges that the bookkeeper thought were not proper company expenses. *Id.* at 36. These included meals and entertainment expenses, as well as trips to Hawaii, Alaska, Atlanta, Gatlinburg, Lancaster, Atlantic City, and Las Vegas. *Id.* at 37-38, 148-54. Tad took Watson with him on these trips and slept with her in the same bed. *Id.* at 148-53. Tad also waived the company's commission on a home purchased by Watson. *Id.* at 42-43. The real estate agents with the firm eventually complained that Tad had become "so involved" with Watson that he could not "give them as much time as they felt like they should be getting." *Id.* at 42.

The bookkeeper also observed a distinct change in Erma's emotional and mental stability. She seemed "distressed and depressed." *Id.* at 45. Her husband's conduct appeared to have "impacted her life greatly." *Id.* at 54. The bookkeeper was so concerned about the situation she confronted Watson, saying that eventually "a lot of people would get hurt, her family and his family both" if the relationship continued along the path it was heading. *Id.* at 41.

At the Commissioner's hearing, Tad Stephenson was asked, "Since December of 1995 have you had sexual intercourse with Ms. Marie Watson?" *Id.* at 129-30. His unqualified answer: "No." *Id.* In follow-up questioning, Tad changed his response to "yes" and then immediately volunteered the caveat that his adultery allegedly took place after he left the marital home in 1997. *Id.* at 130-31.

## B. *The Stock Valuation Issue*

Tad and Erma Stephenson own half of R. L. Stephenson Realty, Inc., the other half being held by Tad's brother, R. L. ("Sammy") Stephenson. A 1992 shareholder agreement, however, provides: "So long as R. L. Stephenson is both alive and competent to manage the affairs of the corporation, he shall retain voting control of the corporation as if he owned 51 percent of the stock even though he only owns 50 percent." Respondent's Exhibit ¶ 1. In the event Sammy (who is 68 years old) either dies or becomes incompetent, the fifty-one percent voting power automatically shifts to Tad, giving him "the same authority and voting control as R. L. Stephenson had." *Id.*; *see also* Hearing Transcript at 190.

The company operates as (i) a real estate agency that "buys and sells" on behalf of others, (ii) a management company that "manages real estate and other properties," and (iii) an investment company that holds a managing interest in "three operating partnerships." Hearing Transcript at 223. Tad

serves as the "principal broker" for the company, which includes the duties of "management of the agents and the general management of the office." *Id.* at 125, 189, 194-99, 204. Sammy has retired from any day-to-day involvement in the company but still controls major financial decisions. *Id.* at 189-90. For all practical purposes, Sammy has "withdrawn from the business," and Tad appears to have "full responsibility for the operation of the business." *Id.* at 373, 377.

When asked if Tad participated with Sammy in making corporate decisions involving their interests in various real estate partnerships, Sammy replied: "Absolutely, because he's part of the company." *Id.* at 211-12. In business together for many years, the two brothers "never have had a disagreement" on any issue because, as Sammy explained it, "we work together." *Id.* at 214.

Like most small companies, R. L. Stephenson Realty does not pay dividends to shareholders for tax reasons. *Id.* at 190-91, 207, 268. Throughout the history of this company, the percentage of equity ownership has determined the "management salaries" the two brothers received. *Id.* at 198, 212-13. Initially, Tad owned a one-third interest and received only one-third of the net profits. *Id.* at 198. His brother, Sammy, owned the other two-thirds share and took the same proportion in pay. *Id.* at 198-99. When Tad's interest (collectively with his wife's) rose to fifty percent, his management salary equaled his brother's. *Id.*

Following the assignment of retained earnings and payment of business expenses, Sammy made sure his brother "got an equal amount" of the profits. *Id.* at 198. Indeed, the brothers used a "pretty specific formula" to make sure "that everything was split equally down the middle." *Id.* at 225. They made "extensive efforts" to ensure each was "treated exactly equal." *Id.* at 317. Their distribution formula "netted out that when you got to the bottom it was a 50/50 split." *Id.* Tad later formed a company named Concept of Realty (owned ninety percent by Marie Watson) and asked that his share of the profits from R. L. Stephenson Realty be paid directly to his new company. *Id.* 47-49, 110-11, 158, 164, 200-02, 208.

The gross corporate income over the years has been trending upward, with the 1999 to 2000 fiscal year producing just over $604,000. *Id.* at 224-25. The principal value of the company, however, lies not in its income producing capacity but in its ownership of appreciating real estate assets. Erma Stephenson's expert witness, Gregory F. Lawson, C.P.A., reviewed various valuation models (book value, capitalization of earnings, adjusted book value, capitalization of excess earnings, and the like) and chose the "adjusted book value method," which "resulted in the least value" of the two asset-based

approaches. *Id.* at 234.[4] This led to a value of $475,100 for Tad and Erma's fifty-percent interest. *Id.* at 239. Lawson included no goodwill in his valuation. *Id.* at 292.

Lawson rejected the use of a marketability discount because of the absence of any evidence that the business was "to be sold within the near term." *Id.* at 228, 324-25. The company has never been marketed for sale, and no one has ever expressed any interest in buying Tad and Erma's fifty-percent interest. *Id.* at 191-92. To be sure, there has been no "thought of selling" the company by either brother. *Id.* at 203-04. And Sammy has no interest in buying Tad and Erma's shares. *Id.* at 191.

Lawson also explained that a minority interest discount would not be appropriate because (i) "even as a 49 percent owner," in terms of voting rights, Tad and Erma Stephenson still had significant legal rights protected by Virginia law, and (ii) in cases where "the majority owner treats everybody equally and everybody in the same interest as he would treat himself, then the whole theory of minority interest disappears." *Id.* at 287. Under the intrinsic value model, Lawson explained, marketability and minority interest discounts should not be used "absent other conditions that aren't in existence here." *Id.* at 328.

Finally, Lawson pointed out that to "arrive at a percentage for marketability discount and minority interest discount is an intensive undertaking." *Id.* at 261, 263. To do this competently, the valuation expert should review "industry information" along with recognized "peer-review studies" that analyze and report on "real world sales." *Id.*

Tad Stephenson's expert, Frank E. Sheffer, has been an accountant since 1949 and has prepared R. L. Stephenson Realty's tax returns for twenty years. *Id.* at 339-40. Sheffer admitted that he does not "appraise property" or "give valuations." *Id.* at 340-41. He conceded too that "I told you I am not an appraiser. I didn't attempt to appraise the stock." *Id.* at 382. Sheffer also did not identify any continuing education courses he has completed on stock valuation methods or minority-interest discounts or any specific certifications he has earned as a business valuator. Nor has Sheffer ever researched the "intrinsic value" concept used in Virginia equitable distribution law. *Id.* at 342, 348, 350, 380.

---

[4] Lawson has had extensive experience in providing expert opinions on the valuation of businesses. *See* Complainant's Exhibit 7, at 30-33. Among other associations, Lawson belongs to the National Association of Certified Valuation Analysts and the AICPA Business Valuation Division.

Sheffer defined "intrinsic value" as the "fair market value" of an interest or, in his words, the price at which a "third-party might be willing to purchase" the interest. *Id.* at 347-48, 387. When told that the "standard in equitable distribution, intrinsic value, looks to the value to the parties to the divorce action," Sheffer stated that he was not "familiar" with that concept. *Id.* at 350. Though offered as an expert on valuation for equitable distribution, Sheffer candidly admitted: "I don't know anything about values having to do with marriage." *Id.* at 348. "I know nothing about the divorce law in Virginia," Sheffer conceded. *Id.* at 380.[5]

Sheffer testified that, as he understood it, the stockholder agreement gave Sammy Stephenson "*all* voting rights, up to a *hundred percent* of the stock in the corporation." *Id.* at 356 (emphasis added). Sheffer believed that the stock value should be discounted when a stockholder agreement provides "absolutely no voting rights, none whatsoever" for the minority shareholders. *Id.* at 357. Sheffer expressly predicated his discount opinion on the assumption that the stockholder agreement provides "no voting right whatsoever" to Tad and Erma, *id.* at 365, and that Tad had "transferred all of his voting rights in his forty-nine percent ownership of the stock" to his brother, *see* Respondent's Exhibit 2, at 2. "You don't even get to vote at a stockholder's meeting." Hearing Transcript at 372. "So because of that I think it should be discounted." *Id.* at 365.[6]

---

[5] Sheffer's testimony on his own qualifications to appraise a business was neither consistent nor understandable. When asked directly "how many valuations of businesses have you done in divorce cases," Sheffer replied that he had testified many times in divorce cases but he did not "appraise property" or "give valuations" and that he "did not attempt to appraise the stock." Hearing Transcript at 341, 382. When pressed on this issue, Sheffer said he had performed "zero" such appraisals of businesses. *Id.* Sheffer later claimed he had in fact given expert opinions "as to the valuation of businesses," but had "stopped doing this about, I guess, eight or ten years ago when they came out with a new discipline for appraisals. . . ." *Id.* at 344. In an unpersuasive attempt to resuscitate Sheffer's qualifications, Tad Stephenson's counsel limited the appraisal concept (and thus tried to narrow the area of Sheffer's nonexpertise) to valuing real estate. *Id.* at 344. Not one of the earlier questions, however, asked Sheffer for his qualifications on appraising real estate. Each question clearly focused on whether he was qualified as an expert on the "valuation of businesses" in divorce cases. *Id.* at 340-42. Though Sheffer later said he had been accepted as an expert on business valuation, his testimony on this issue did little to bolster his position. *Id.* at 347 (Q: "[Y]ou said you don't do appraisals, though, of businesses." A: "That's correct.").

[6] Sheffer also claimed that "every time" he had seen a stock valuation involving a closely held company owning anything other than liquid assets, the valuation would include a fifteen-percent marketability discount and a fifteen-percent minority discount. *See*

The Court's referral order, submitted jointly by both parties, directed the Commissioner to report his findings on various topics, including (i) the circumstances and factors that contributed to the dissolution of the marriage, (ii) the monetary and non-monetary contributions of each party to the well-being of the family, and (iii) the physical and mental condition of the parties. *See* Order of Reference ¶¶ 9, 12, 13 (May 10, 2000). In addition, the referral order requested a recommendation on the proper value of the marital assets. *Id.* ¶ 6, at 2. The referral order, however, did not request any recommendation on the actual division of assets between the parties or the appropriate ratio for such a task. The Commissioner and the parties understood this limitation. *See* Hearing Transcript at 23-25.

In his report, the Commissioner found that the "circumstances which led to the parties' separation and the dissolution of the marriage *relate directly* to Mr. Stephenson's relationship with Ms. Marie Watson." Commissioner's Report ¶ 13, at 9-10 (Oct. 18, 2001) (emphasis added). In addition, the Commissioner concluded that this extramarital relationship constituted a "negative non-monetary contribution" to the well-being of the family. *Id.* ¶ 9, at 9. But because the relationship "did not have an economic impact" on the marital assets, the Commissioner dismissed it as lacking "significant weight" in tipping the equities in Erma Stephenson's favor. *Id.* Working from that premise, the Commissioner concluded both parties made an "equal contribution" to the marriage. *Id.*

On the stock valuation issue, the Commissioner accepted the adjusted book value calculated by Lawson. *Id.* ¶ 6, at 8. From that figure, however, the Commissioner applied a thirty-percent discount attributable to the stock's lack of marketability and its status as a *de facto* minority interest in a closely held corporation. *Id.* He dismissed Lawson's position on this issue, asserting that Lawson had adopted a *per se* rule forbidding such discounts based upon his misunderstanding of Virginia law. *Id.* ¶ 6, at 7.[7] After determining that

---

Hearing Transcript at 381. When asked about this, Lawson testified that "in a professional business evaluation you would find that to be very, very unusual." *Id.* at 392.

[7] "Your Commissioner has concluded, from Mr. Lawson's own testimony, that he would have used discounts, except for the legal conclusions which he drew from *Howell* and *Ferrarro.* Mr. Lawson interpreted that these cases set forth the principle that discounts cannot be used in determining intrinsic value. As previously stated, these cases have not set *per se* rules or objective standards of inclusion or exclusion for valuation purposes, nor has any other reported case in our appellate system. Having concluded that discounts

Virginia law erected no such absolute prohibition, the Commissioner assumed Lawson's own reasoning would permit a discount in any amount between five to fifty percent. *Id.* The Commissioner then selected the thirty-percent figure, which, the Commissioner reasoned, was within the range acceptable to Lawson "if he had not mistakenly thought that he was prevented from doing so." *Id.*

The Commissioner's reasoning on this issue did not involve a resolution of contested facts or a credibility determination between two competing experts. The parties did not dispute the facts.[8] Instead, the Commissioner's conclusion rested upon his characterization of Lawson's opinion as a *per se* rule, rather than an as-applied valuation principle that turned on the specific conditions of the stock being valued. *Id.* ¶ 6, at 7.

Erma Stephenson filed exceptions to the Commissioner's report on several grounds, including a challenge to the Commissioner's treatment of the marital fault issue and his thirty-percent discount applied to the stock value. On the marital fault issue, Erma argues that the Commissioner correctly found that Tad's extramarital relationship with Watson was the only identifiable circumstance leading to the dissolution of the marriage. But the Commissioner, she asserts, incorrectly assigned no legal weight to this fact in the equitable distribution analysis. On the stock discount issue, Erma contends that the Commissioner misunderstood Lawson's testimony and failed to apply the proper as-applied legal standard to the uncontested facts of this case.

Tad Stephenson filed no exceptions to the Commissioner's report. As a result, the Commissioner's findings adverse to Tad Stephenson stand as the law of the case. "The established rule in Virginia is that parts of the commissioner's report not excepted to are considered as admitted to be correct, as the party excepting, must put his finger on the error that the court may see what it has to decide." *McLaughlin v. McLaughlin,* 2 Va. App. 463, 470, 346 S.E.2d 536, 539 (1986) (citation omitted); *see also Matthews v. Matthews,* 26 Va. App. 638, 649, 496 S.E.2d 126, 131 (1998).

---

for lack of marketability and minority ownership should be included in the methodology used in valuing the minority interest which the parties hold in R. L. Stephenson Realty, Inc., the question then becomes, what discount percentage should be used?" Commissioner's Report ¶ 6, at 7.

[8] Whether a discount should be applied, Tad Stephenson's counsel argued before the Commissioner, "is purely an issue of law." Hearing Transcript at 348. It is better characterized, however, as a mixed question of law and fact. The legal principles governing the issue still require factfinding to determine if these principles weigh in favor or against the application of a discount.

Before weighing the statutory factors in aggregate and then proceeding with a final order of distribution (a task not referred to the Commissioner), the Court must resolve the two exceptions filed by Erma Stephenson.

## II. *Plaintiff's Exceptions*

Under Virginia practice, a chancellor should review *de novo* any legal conclusion reached by a commissioner. *See Roberts v. Roberts*, 260 Va. 660, 667, 536 S.E.2d 714, 718 (2000). As to factual findings, the "report of a commissioner in chancery shall not have the weight given to the verdict of a jury on conflicting evidence, but the court shall confirm or reject such report in whole or in part, according to the view which it entertains of the law and the evidence." Va. Code Ann. § 8.01-610 (Michie 2000). A commissioner's resolution of factual conflicts ordinarily should be affirmed unless his findings are "not supported by the evidence." *Roberts*, 260 Va. at 667, 536 S.E.2d at 719 (quoting *Hill v. Hill*, 227 Va. 569, 576-77, 318 S.E.2d 292, 296-97 (1984)); *Snyder Plaza Properties, Inc. v. Adams Outdoor Adver., Inc.*, 259 Va. 635, 641, 528 S.E.2d 452, 456 (2000); *Joynes v. Payne*, 36 Va. App. 401, 414, 551 S.E.2d 10, 16 (2001). That said, the trial court still "has the duty to make factual determinations." *Kaufman v. Kaufman*, 7 Va. App. 488, 501, 375 S.E.2d 374, 381 (1988). And the court "may not delegate that duty to the commissioner, but must affirm or reject the commissioner's report, in whole or in part, according to the view the court entertains of the law and the evidence." *Id.*

## A. *Marital Fault*

On the marital fault issue, the Court disagrees with the Commissioner's legal analysis and finds his factual findings unsupported by the evidence. Without any objection by Tad Stephenson, the Commissioner correctly found that Tad's improper relationship with Watson caused the "separation and the dissolution" of Tad's thirty-seven year marriage with Erma. Commissioner's Report ¶ 13, at 9-10. Where the Commissioner erred was his dismissal of that fact as legally inconsequential because it had no financial impact on the marital estate. *Id.* ¶ 9, at 9.

Under Virginia equitable distribution principles, the negative impact of marital fault can be considered. *O'Loughlin v. O'Loughlin*, 20 Va. App. 522, 528, 458 S.E.2d 323, 326 (1995). And the fault need not be the basis for the final divorce. *See Cousins v. Cousins*, 5 Va. App. 156, 158, 360 S.E.2d 882,

884 (1987); *Bacon v. Bacon*, 3 Va. App. 484, 490, 351 S.E.2d 37, 41 (1986); *Bentz v. Bentz*, 2 Va. App. 486, 488, 345 S.E.2d 773, 774 (1986). To be a valid consideration, however, the marital fault must be relevant to one of the statutory factors listed in Va. Code Ann. § 20-107.3(E) (Michie 2000).

Finding the proper role for marital fault in the equitable distribution analysis has not been an easy task for Virginia courts. The effort began with *Aster v. Gross*, 7 Va. App. 1, 5, 371 S.E.2d 833, 836 (1988). In that case, the Court of Appeals interpolated into the text of § 20-107.3(E)(5), the provision expressly directing the trial court to consider marital fault, a caveat that marital fault *cannot be considered at all* unless it affects "the partnership's economic condition." *Aster* added this unwritten caveat to subsection (E)(5) asserting that it necessarily follows from the "philosophy that marriage represents an economic partnership." *Id.* Faithful to this philosophy, *Aster* held that a husband's alleged seven adulteries with different women "bore no relation to the value of the parties' marital assets" and thus could not be considered under subsection (E)(5). *Id.* As far as *Aster* was concerned, how the parties treated their assets mattered more than how they treated each other. *See generally* Brett R. Turner, *Equitable Distribution of Property* at 885-86 (Supp. 2001).[9]

Later appellate opinions view the marriage union in less pecuniary terms and limit the *Aster* caveat to subsection (E)(5). In *Smith v. Smith*, 18 Va. App. 427, 431, 444 S.E.2d 269, 273 (1994), the Court of Appeals recognized that marital fault may constitute a "negative impact of the affair on the well-being of the family" under § 20-107.3(E)(1), as well as on the "mental condition of the parties" under § 20-107.3(E)(4). The *Smith* clarification became clearer in *O'Loughlin* when the Court of Appeals held that marital fault could be

---

[9] In support of its interpretation of Va. Code Ann. § 20-107.3(E)(5), *Aster* cited L. Golden, *Equitable Distribution of Property* § 8.13, at 255 (1983), a general treatise surveying divorce law in the United States. In a supplement to the second edition of that treatise, the present author observes: "*Aster* was a questionable decision, as the Virginia statute expressly states that fault of any type is one relevant factor in dividing marital property. Va. Code Ann. § 20-107.3(E)(5). Moreover, the specific types of fault listed in Va. Code Ann. § 20-107.3(E)(5) do not have any inherent economic impact. Finally, economic fault is already relevant to equitable distribution as a negative contribution to the marriage under Va. Code Ann. § 20-107.3(E)(1). If § 20-107.3(E)(5) encompasses only economic fault, it adds no division factor which is not already present in § 20-107.3(E)(1). Thus, *Aster* essentially construed § 20-107.3(E)(5) to be superfluous." Brett R. Turner, *Equitable Distribution of Property* at 885 (Supp. 2001). The Virginia Supreme Court has not interpreted § 20-107.3(E)(5) or cited *Aster* either favorably or disfavorably.

considered under § 20-107.3(E)(1) as a "negative non-monetary contribution to the marriage" regardless of its lack of any economic impact on the family's balance sheets. *Barker v. Barker*, 27 Va. App. 519, 540, 500 S.E.2d 240, 250 (1998) (citing *O'Loughlin*, 20 Va. App. at 528, 458 S.E.2d at 326).

Though "equitable distribution is not a vehicle to punish behavior, the statutory guidelines authorize consideration of such behavior as having an adverse effect on the marriage and justifying an award that favors one spouse over the other." *O'Loughlin*, 20 Va. App. at 527, 458 S.E.2d at 325. In other words, while equitable distribution should not "degenerate into a witch hunt for marital misconduct," there should still be "legally enforceable rules of conduct for spouses during the marriage." Turner, *supra* at 886 (characterizing *O'Loughlin* as "much more consistent with the statute" than *Aster* and an "excellent decision which improved Virginia law").

Here, the Commissioner's report identified the husband's extramarital relationship with Watson as a "negative nonmonetary contribution to the well being of the family" under § 20-107.3(E)(1) and then summarily dismissed it as having no "economic impact" on the family's net worth. Under *O'Loughlin*, however, a negative nonmonetary contribution under § 20-107.3(E)(1) need not have any economic impact before it can be considered as an equitable distribution factor. The Commissioner followed this *prima facie* error of law with what appears to be an alternative factual finding asserting that, in any event, the overall contributions of both parties to the well-being of the family were about equal. If this was meant to be an alternative finding, it cannot be supported by the evidence.

Though her husband provided most of the financial contributions to the family, Erma Stephenson contributed approximately eighty percent of the non-monetary contributions. *See* Complainant's Exhibit 6; Hearing Transcript at 88-90. Over the course of her thirty-seven year marriage, she managed the household, raised two children, remained loyal to her husband, and worked outside the home. The Commissioner did not identify a single negative contribution attributable to her. What ended this marriage, in the words of Tad Stephenson, was his view that he "had lived his life for everybody else up to this point but now he was going to start living his life for himself." Hearing Transcript at 101. This egocentric decision took a serious toll on Erma's emotional and mental condition. She became depressed and withdrawn, slipped into uncontrollable bouts of weeping, and eventually required counseling, therapy, and medical care. *See* Hearing Transcript at 45, 54, 100, 105, 108, 413-14, 439.

Given these uncontested facts, the Court rejects as unfounded the Commissioner's finding that, under § 20-107.3(E)(1), the parties' respective

contributions to the marriage balanced out fairly evenly. Erma contributed no discernable negative contributions to the marriage — while Tad contributed one so devastating that it ended the marriage. To conclude the overall contributions were equal seems little more than application of the discredited 50/50 presumption.[10] Tad's disloyalty to his wife, therefore, had a quantitative effect on the well-being of the family and should be assigned weight as a "negative nonmonetary contribution to the marriage" despite its apparent lack of any specific economic impact on the family's net worth. *Barker*, 27 Va. App. at 541, 500 S.E.2d at 250; *O'Loughlin*, 20 Va. App. at 528, 458 S.E.2d at 326.[11] For similar reasons, the Court rejects as insupportable the Commissioner's failure to address in any detail the effect Tad Stephenson's relationship with Watson had on his wife's mental condition, a relevant consideration under § 20-107.3(E)(4). *See Smith*, 18 Va. App. at 431, 444 S.E.2d at 273.

True, these matters may not warrant preponderating weight in the overall distributive formula and should not be used as a mere pretext to "punish behavior," *O'Loughlin*, 20 Va. App. at 526-27, 458 S.E.2d at 325, but it is equally true that they still should not have been summarily dismissed as legally insignificant.

## B. *Stock Valuation*

Turning next to the stock valuation issue, the Commissioner accepted the adjusted-book-value model used by Lawson. This asset-based calculation estimated the value of the assets owned by R. L. Stephenson Realty and attributed half of this value ($475,100.00) to Tad and Erma Stephenson's fifty-percent ownership interest. The Commissioner, however, made a thirty-percent discount from this figure due to the limited marketability of the closely held shares and their minority voting status. For good reason, Erma Stephenson objects to this deduction.

Virginia's equitable distribution law employs the concept of "intrinsic value" when determining the worth of marital assets. *See Howell v. Howell*, 31

---

[10] "Virginia law does not establish a presumption of equal distribution of marital assets." *Matthews v. Matthews*, 26 Va. App. 638, 645, 496 S.E.2d 126, 129 (1998) (citing *Papuchis v. Papuchis*, 2 Va. App. 130, 132, 341 S.E.2d 829, 830 (1986)).

[11] During oral argument before the Court, Tad Stephenson's counsel did not contest this point directly. Rather, counsel suggested that his proposed distribution plan (which called for Erma to receive a higher proportion of the marital assets than Tad) adequately accounted for whatever weight should be assigned to the *O'Loughlin* fault consideration.

Va. App. 332, 338, 523 S.E.2d 514, 517 (2000). "Intrinsic value is a very subjective concept that looks to the worth of the property to the parties." *Id.* It cannot be limited by objective criteria commonly used in open market transactions:

> *The item may have no established market value, and neither party may contemplate selling the item; indeed, sale may be restricted or forbidden.* Commonly, one party will continue to enjoy the benefits of the property while the other must relinquish all future benefits. Still, its intrinsic value must be translated into a monetary amount. The parties must rely on accepted methods of valuation, but the particular method of valuing and the precise application of that method to the singular facts of the case must vary with the myriad situations that exist among married couples.

*Howell,* 31 Va. App. at 339, 523 S.E.2d at 517-18 (emphasis added). For example, an equity interest in a law partnership cannot be sold, and its redemption value to the partner may be restricted to a nominal capital account. Those circumstances, however, do not preclude an intrinsic valuation that takes into account goodwill. *Id.*

Similar principles apply to stock in a family-owned company. Closely held shares may be subject to mandatory buy-out provisions at artificially low prices. From a corporate-law perspective, such restrictions provide continuity and protection against outside intervention. From an equitable-distribution point of view, however, these provisions "do not necessarily represent the intrinsic worth of the stock to the parties" and thus are "not conclusive as to the value of the stock." *Bosserman v. Bosserman,* 9 Va. App. 1, 6-7, 384 S.E.2d 104, 108 (1989). The marketability restriction should be viewed simply as one "factor" in the valuation model. *Id.* Its effect on the final number depends on "the nature, size, and purpose of the corporation; the type and nature of its assets; the terms of the restrictions or transfer provisions; the nature and existence of escape clauses; optional provisions for valuation; and any circumstance which could affect the corporation, the stockholders, or their relationship." *Id.*

When the controlling interests in a family company unfairly oppress a minority shareholder or use a "substantial amount of the corporation's assets" for their own personal benefit, the trial court may take that fact into consideration in determining the value, if any, of the minority interest. *Jacobs v. Jacobs,* 12 Va. App. 977, 979, 406 S.E.2d 669, 671 (1991). But when the controlling interests neither oppress minority shareholders nor dissipate

corporate assets, the trial court may conclude that the "minority ownership did not diminish the value" of the stock. *Ferraro v. Ferraro*, 2000 Va. App. LEXIS 164 at *14, 2000 WL 251678 at *5 (Va. App. 2000).[12] Similarly, any discount that assumes a future sale (like a discount for an estimated capital gains tax) should be considered only if the parties contemplate an actual, not merely hypothetical, sale of stock. *See Arbuckle v. Arbuckle*, 22 Va. App. 362, 470 S.E.2d 146 (1996), *later appeal*, 27 Va. App. 615, 618, 500 S.E.2d 286, 288 (1998) (if no actual sale contemplated, a discount is "too speculative" and amounts to "mere guesswork").

When a closely held corporation serves as a "real estate holding company," most courts value the shares based on the company's net assets. *Bosserman*, 9 Va. App. at 8, 384 S.E.2d at 109. In *Bosserman*, a case involving just such a company, the Court of Appeals quoted with approval an IRS summary confirming this approach:

> The value of the stock of a closely held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market value of the assets of the company. . . . For these reasons, the adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether or not family owned, than any other common yardsticks of appraisal, such as earnings or dividend paying capacity.

*Id.*, 9 Va. App. at 8-9, 384 S.E.2d at 109 (citation omitted). Competent expert testimony must be presented to justify a departure from the "net corporate assets" approach. *Id.*

Here, the only competent expert testimony came from Lawson. And contrary to the Commissioner's interpretation of his remarks, Lawson did not adopt a *per se* prohibition against marketability or minority discounts for

---

[12] The Commissioner (as well as both parties) cite and discuss *Ferraro*, an unpublished opinion. Though the appellate panel that issued *Ferraro* chose not to designate it for publication, *see* Va. Code Ann. § 17.1-413(A) (Michie 1999), that does not mean that the case cannot be cited. Unpublished opinions may have no precedential value, but they have persuasive value both to the bar and the trial bench. As a result, a trial court may consider the "rationale" of an unpublished opinion and adopt it "to the extent it is persuasive." *Fairfax County School Bd. v. Rose*, 29 Va. App. 32, 39, n. 3, 509 S.E.2d 525, 528, n. 3 (1999) (*en banc*).

closely held corporations. Instead, Lawson made clear that these discounts should not apply "absent other conditions that aren't in existence here." Hearing Transcript at 328. Those unique conditions, which Lawson found absent in this case, include the lack of any interest by the shareholders to market the stock for sale, the absence of any history of oppressive or unequal treatment by the controlling shareholder, and nonexistence of any proof that the minority shareholder's interest had been stripped of its legal rights under Virginia law. *Id.* at 228, 287, 325, 328.

Uncontested evidence confirmed each of Lawson's caveats. Neither Tad nor Sammy has ever expressed any interest in selling any shares in the company to a third party. Though the stockholder agreement gives Sammy the right to vote fifty-one percent of the stock, his brother Tad and his wife retain a forty-nine percent voting interest. And Tad will acquire the fifty-one percent voting rights upon Sammy's death or disability. None of the witnesses could recall a single instance when the two brothers ever disagreed with each other over the direction of the company. Nor has Sammy's exercise of his voting rights in the company in any way imperiled his brother's inchoate equity interest in the underlying properties or prejudiced his equal share of the distributive profits. Even though Sammy has a 51/49 voting advantage over his brother, Sammy has never used this power to elevate his personal interests over his brother's during the many years they have worked together.

Despite Sammy's paper control of the company, he still remains bound by Virginia law to fulfill his fiduciary duties and to preserve the best interests of the corporation. *See* Va. Code Ann. § 13.1-690(A) (Michie 1999) (director's duty of good faith). Virginia law gives minority shareholders the right to an involuntary dissolution upon proof that the controlling directors have "acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent," or have "misapplied or wasted" corporate assets. Va. Code Ann. §§ 13.1-747(A)(1)(b) and (d) (Michie 1999). A less potent, but still effective, remedy also lies with a stockholder derivative suit in equity. *See* Va. Code Ann. §§ 13.1-672.1 to 13.1-672.5 (Michie 1999) (providing for injunctive relief and prevailing-party attorney's fees). "Derivative suits play an important role in protecting shareholders of corporations from the designing schemes and wiles of insiders who are willing to betray their company's interests in order to enrich themselves." *Simmons v. Miller,* 261 Va. 561, 573, 544 S.E.2d 666, 674 (2001) (citation omitted). Thus, even if Sammy decided to divert all corporate profits to himself and to convert corporate assets for his personal benefit, Virginia law would stand immovably in his way.

Over the wife's objection, the Commissioner qualified Sheffer on the issue of stock valuation and admitted into evidence his opinion on value

discounts. The Commissioner explained that, "I'm going to qualify Mr. Sheffer *because* I have known him for years and probably had him testify, I don't know, but the point is, it certainly was allowed. . . . If you want for the record to put this on that's fine [i.e. Sheffer's lack of familiarity with the legal standard of valuation], *but I can assure you I'm going to qualify him." Id.* at 349-50 (emphasis added).

Qualification of an expert witness, however, must rest solely on the evidence before the Court and not upon any private opinion of the factfinder. Under Virginia law, "the individual and extrajudicial knowledge on the part of a judge will not dispense with proof of facts not judicially cognizable, and cannot be resorted to for the purpose of supplementing the record." *Darnell v. Barker*, 179 Va. 86, 93, 18 S.E.2d 271, 275 (1942) (citation omitted). It is "plain error" for a judicial officer to "go outside the record" in support of his or her decision on any material issue. *Russell County School Bd. v. Anderson*, 238 Va. 372, 385, 384 S.E.2d 598, 605 (1989). Sheffer's qualifications to testify as an expert, therefore, must be found in the evidence before the Court — not in the Commissioner's private knowledge of the witness or any professional relationship he might have had with him in the past.[13]

As the Virginia Supreme Court has explained, "the expressed belief of a witness that he is an expert does not *ipso facto* require his qualification. . . . The facts must show that he possesses sufficient knowledge, skill, or experience to make him competent to testify as an expert on the subject matter of the inquiry." *Lawson v. Elkins*, 252 Va. 352, 354-55, 477 S.E.2d 510, 511 (1996) (citation omitted). The knowledge necessary to qualify a witness to testify as an expert may be "derived from study alone, or experience, or both." *Wood v. Bass Pro Shops*, 250 Va. 297, 304, 462 S.E.2d 101, 105 (1995) (citation omitted).

On the narrow issue presented, the intrinsic value under equitable distribution principles of closely held corporate shares, the evidentiary record does not show that Sheffer possessed sufficient knowledge to qualify as an expert in this case. Preparing the company's tax returns, standing alone, does not give him the specialized competence necessary to determine the worth of corporate shares pursuant to the intrinsic value standard required by Virginia

---

[13] A commissioner in chancery serves as a "quasi judicial officer." *Brown v. Brown*, 11 Va. App. 231, 234, 397 S.E.2d 545, 547 (1990) (citation omitted). As such, the ethical principles governing trial judges "like those prohibiting a decision based on matters outside the record, those barring an *ex parte* contact with the litigants or their counsel, and those forbidding even an appearance of impropriety" also apply to commissioners while acting within the scope of their duties.

equitable distribution law. To be sure, Sheffer admitted he knew nothing about the concept of intrinsic value. Though an expert need not be able to quote legal precedent or interpret the latest appellate opinion on the subject, he should be capable of articulating the overarching standard against which his opinion can be judged. In this case, the whole point of Sheffer's testimony, intrinsic value, was an unfamiliar concept to him.

Even if Sheffer could qualify as a valuation expert for equitable distribution purposes, his opinion in this case rests on a false premise. He repeatedly pointed out that his opinion to apply a discount rested on the assumption that Tad had "absolutely" no voting rights "whatsoever" in the company, Hearing Transcript at 356-57, 35, 365, 372, and that Tad had "transferred all of his voting rights in his forty-nine percent ownership of the stock" to his brother, *see* Respondent's Exhibit 2, at 2. No evidence suggests, however, that Tad and Erma own non-voting shares. To the contrary, they control forty-nine percent of the voting rights in the company and own fifty percent of the stock. Under Virginia statutory law and equity principles, Sammy could not disenfranchise them from sharing in the continued equity growth of the company's assets. Nor could Sammy arbitrarily reallocate all of the distributive profits to himself (particularly given his retirement from any active role in the firm's management) without the near certain challenge of a shareholder derivative suit or an action seeking involuntary dissolution. Even if it were accepted at face value, therefore, Sheffer's opinion rests on a seriously flawed assumption.

### III. *Conclusion*

The Court agrees with Erma Stephenson on her objections to (i) the Commissioner's failure to give any weight to her husband's negative nonmonetary contributions to the marriage or the effect of his extramarital relationship with Watson on his wife's mental condition, and (ii) the Commissioner's use of a thirty-percent discount to reduce the value of the stock in R. L. Stephenson Realty, Inc. In its final order of distribution, the Court will take into account Tad Stephenson's marital fault and assign an appropriate distributive weight to it. The stock shares owned by Tad and Erma Stephenson will be valued at $475,100 without any further discount. It is so ordered.