COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Beales and Athey
Argued at Richmond, Virginia

UNPUBLISHED

JAMES A. COX

v.      Record No. 1464-24-2

MELISSA A. V. COX

MEMORANDUM OPINION[*] BY
JUDGE CLIFFORD L. ATHEY, JR.
FEBRUARY 3, 2026

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Steven B. Novey, Judge

Dawn B. DeBoer (DeBoerSouth, PLLC, on briefs), for appellant.

Brandy M. Poss (Barnes & Diehl, P.C., on brief), for appellee.

This case arises from a July 31, 2024 final decree of divorce in the Circuit Court of

Chesterfield County ("circuit court"), granting Melissa A. V. Cox ("wife") a divorce from James

A. Cox ("husband"). On appeal, husband contends that the circuit court erred: 1) when

determining the value of the cash balance pension plan; 2) when finding that husband's income

was $75,000 a month; and 3) when setting the amount of wife's spousal support. For the

following reasons, we affirm.

I. BACKGROUND[1]

On October 5, 2022, wife filed a complaint in the circuit court seeking a divorce from her

husband. In support, she alleged that they had married on July 29, 2000, and that three children

were born during their marriage. She also alleged that they had lived separate and apart

---

[*] This opinion is not designated for publication. See Code § 17.1-413(A).

[1] "On appeal, we are required to view the facts in the light most favorable to wife because she was the prevailing party" in the circuit court. *McGinnis v. McGinnis*, 69 Va. App. 572, 573 (2018).

continuously since July 16, 2021. Wife further asserted that her husband was "guilty of cruelty," had committed adultery, and had deserted her. Husband filed an answer and a counterclaim seeking a divorce from his wife. In support of his counterclaim, husband contended that his wife was "guilty of cruelty and constructive desertion." At trial, the circuit court received evidence that in the spring of 2021 during their marriage, husband had created a Match.com dating account. The circuit court also heard testimony from Linda Gardner ("Gardner"), who admitted that she had met husband in November of 2021 on a dating site. Gardner further testified that husband had provided her financial assistance on several occasions, including paying for her cell phone bill, her lawn service bill, and for her groceries. When Gardner was asked if she and husband had been sexually intimate, she testified that they had only kissed. When husband was later questioned regarding whether he had been sexually intimate with Gardner during his marriage, he declined to answer in reliance on his Fifth Amendment right against self-incrimination. The circuit court later drew an "adverse inference" from husband's response to the inquiry, later noting that the court had "consider[ed] his adulterous activity while married in fashioning an equitable distribution award." Ultimately, the circuit court granted wife a no-fault divorce based on the parties living separate and apart continuously for 12 consecutive months.[2]

This case primarily concerned husband's membership in CBH Holdings, LLC ("CBH"), a financial planning services company, where he worked along with two other members of CBH. LPL Financial ("LPL") served as the "broker dealer" for CBH, and LPL acted in "a regulatory and supervisory" capacity as the "registered investment advisor entity responsible for complying with various . . . FINRA[3] regulations." CBH received revenue from its relationship with LPL in

---

[2] Husband does not assign error to the circuit court's order concerning the grounds for divorce or its rulings on child custody.

[3] FINRA is an acronym for the Financial Industry Regulatory Authority. *See Bank of the Commonwealth v. Hudspeth*, 282 Va. 216, 218 (2011).

exchange for CBH managing the assets and accounts of LPL's clients. Husband received an IRS Form 1099 from LPL annually and equally divided the income reflected on each Form 1099 with the other members of CBH. Husband testified that all the statements and documents executed by the LPL clients he managed were under LPL's name. CBH possessed around $600 million in assets under management ("AUM") on December 31, 2022.

A. *The Cash Balance Pension Plan*

The circuit court also received a significant amount of testimony and other evidence regarding CBH's financial condition, valuation, and operations. Wife's expert witness Brian Burns ("Burns") opined on the market value of CBH, and husband's expert witness Robert Raymond ("Raymond") attempted to rebut Burns's conclusions as to the market value of CBH and the portion thereof assignable to husband. Burns also provided expert testimony concerning a financial analysis he performed regarding the value of a cash balance pension plan ("CBPP" or "plan") maintained by CBH to benefit its members and employees. Burns testified that his valuation was as of December 31, 2022, which was the "most recent date of financial information produced."

Burns explained that the plan was created in 2016 in conjunction with CBH's 401(k) profit sharing plan. Husband characterized the CBPP as a "defined benefit plan" that "was created to have a supplemental retirement savings plan" for the owners and employees of CBH. Burns testified that the CBPP was "a type of plan that provides particularly high earning individuals or business owners with the opportunity to invest in a deferred retirement account at a more significant level" than traditional retirement accounts. He opined that using the plan is "a way that you can invest a significant amount of your earnings in tax-advantage basis that you will be able to access in the future as you reach retirement age."

He added that the plan included "limits in terms of how much of th[e] earnings can be contributed on an annual basis," as well as "limits in terms of how much you can withdraw over the course of your retirement." He further opined that the threshold for these contributions is determined "in part by regulation" and "by agreement between the partners" of CBH. He concluded that if the members of CBH utilized the maximum funding of the plan, it would usually result in 35% federal tax rate savings. In addition, 98.5% of the "vested balance of the cash balance pension plan" remained "for the three partners to divide up." The remaining 1.5% was for the other employees of CBH. Husband stated that he: 1) coordinated with CBH's "benefits administration firm" and the plan's actuary; 2) conferred with his accountant, John Blaser ("Blaser"), regarding the tax implications; and 3) discussed the amount of the contributions with his business partners before determining CBH's annual contribution. Husband emphasized that their "practice" was "to make sure all three of [them] agree[d]" and that he could not decide the contribution amount unilaterally.

Burns also testified concerning the amounts contributed to the plan. He stated that from 2017 to 2022, CBH contributed $3.5 million to the plan, with the balance in the plan on December 31, 2022, being $4.2 million. Burns also noted that CBH contributed $815,000 in 2018, $481,000 in 2019, $825,000 in 2020, $799,000 in 2021, and over $1.2 million in 2022. Burns also testified that although the plan was started in 2016, the first contribution to the plan did not occur until 2017.

Blaser, CBH's accountant since 2007, also testified concerning the plan. He stated that when CBH deposited funds in the plan in 2023, it was actually a contribution for the previous year of 2022. Blaser also testified that CBH had contributed the maximum amount allowable by law into the plan "most every year."

When the husband's expert, Raymond, was asked about contributions to the plan from 2018 to 2022, he testified that the husband had only contributed approximately $271,000 annually to the plan, or about $22,000 a month. Husband testified that over the life of the plan, he had contributed $882,000, with some of the contributions coming from a loan and some from the business's operations. He further stated that the funds for the plan were "generated through the revenue that the business generates" but that using loans to contribute to the plan was an established practice for CBH since the plan was created in 2016, with husband using a line of credit from LPL to get the plan started. He added that loans from LPL—all taken out in husband's name—had been used to fund the plan "three times out of the seven years."

During cross-examination, husband acknowledged that he obtained an individual loan of $1 million from LPL and then placed it in CBH.[4] Husband also conceded that he overfunded the plan every year, as was agreed to by him and the other members of CBH. Husband then testified that he "routinely" overfunded the plan and did not tell his fellow members every time, stating that when he put some of the LPL loan toward the plan, he "probably" told them but "just [didn't] remember." Husband also admitted that he was putting in more money than what was required under the terms of the plan "because the plan assets fluctuate" and he wanted to ensure that CBH did not have "an emergency amount of money to pay when our revenue is down."

During Burns's expert testimony, he also concluded that the plan had been overfunded by $1,200,600 through the end of 2021, a sum that he stated was "a significant amount of marital earnings." Burns further opined that after considering the 2022 balance, husband's share of the plan was $1,419,000. In addition, Burns noted that in 2022, over $500,000 of the funds

---

[4] Husband testified that the loan from LPL was not taken out specifically for funding the plan, "but the money was sitting the[re], a contribution needed to be made, so it was used for that purpose." Husband agreed that when he applied for the LPL loan that he did not specifically list funding the plan as part of the loan application but stated, "[W]e have latitude how we use the funds."

contributed to the plan came from the loan that husband received from LPL. Based on his expert analysis, Burns concluded that based on the previous contributions to the plan, the contributions each year would "on average" be "over half the earnings of the company in total."

During husband's testimony, he contended that "the funding in excess of the benefit calculation, which is by contract and i[s] governed by . . . ERISA," could not be extracted from the plan and that "[o]nce it is in the cash balance plan it is there." He agreed that "the plan can be overfunded from time to time" but also stated that the term "overfunded" was a "technical definition" that could be "cherry-picked to whatever date that you want to determine funding." He further asserted that "you have to choose whether [the plan] will be overfunded and not underfunded." Husband also agreed that his share of the value of the plan up until the date of separation, but not after, was "for sure" marital property.

B. *Husband's Income as a Member of CBH and as an Employee*

Burns and Raymond's disagreement regarding the valuation of the plan affected their respective valuations of husband's income. Both experts agreed that they relied heavily on the income approach in their conflicting valuations and further agreed that it was important to "normalize" husband's salary for purposes of determining husband's income. This is because the members of CBH "do not deduct a salary" for purposes of determining the business's income statement.[5] Burns testified that he first determined a "market level of compensation" for the

---

[5] Burns testified that the income approach and the market approach "should both be considered" when valuing CBH. He stated he was using the income method as the primary method but also using the market approach "as a corroborative method to support the reasonableness" of his income approach calculation. Raymond stated that Burns's valuation of CBH at $3.5 million used the "guideline company transaction method . . . under the market approach." Raymond stated that the market approach "is very seldom accepted in Virginia courts . . . because of limitations in what an owner chose[s] to provide." Raymond stated he would not use this approach but he "maybe" would use it to "validate other approaches." He stated that the fact that Burns's valuation of the company under the market approach method and the income approach method corresponded to each other showed that "the income approach is

three members of CBH because he wanted to separate the "return that you receive as an owner from the compensation you would receive as being an employee." Husband had previously testified that each member received revenue, calculated each calendar quarter, based on the total AUM of CBH.

As part of his valuation of CBH, Burns described the "adjustments" that he made in his valuation report. He noted that CBH—in husband's name—had taken a loan from LPL for $1 million that was "an excess asset of the firm that should be analyzed separately and be added to the value." Burns testified that the last adjustment was "to an accrual of an annual contribution" that CBH makes to "a cash balance plan that would be accrued at each year end," which Burns removed so that it could "be considered separately." Burns noted that he "remove[d] the deduction related to the cash balance plan[] and specifically the partner share of the cash balance plan" because it was a "significant level of contribution into this overfunded cash balance plan."

When asked to explain why he thought it "appropriate" to adjust CBH's valuation based on the contributions to the plan, Burns replied that he deemed the CBPP

> a discretionary investment that the partners at LPF Financial have done to take a significant portion of their earnings and invest it in a retirement vehicle, so that is a discretionary decision that they are making to invest business earnings in this retirement vehicle to save for the future that from a valuation standpoint, you really want to think about a separation of market compensation for services provided at the expense of what that should be versus the earnings that the business generates and the investment of the asset that you hold as being the owner, those are two distinctly separate things that I analyzed appropriately.

Burns further explained that he had adjusted the plan contributions to remove "the portion that would be ascribable to the share of the three partners and left the contribution that would be ascribable to the employees as a business deduction."

also overvalued." Yet Raymond stated that he agreed with Burns to place "more reliance" on the income approach.

By including the overfunding of the plan in reaching a market value for CBH, Burns opined that husband's salary as a non-owner employee was approximately $400,000, and his annual return on investment from being a member of CBH was $500,000. Burns acknowledged that the "most significant adjustment" to husband's income was "the inclusion of the cash balance plan contributions as income." Burns explained that it would be inappropriate and "unreasonable to view [husband's] income for support incorporating such a significant deduction that constitutes [husband's] investment of income in a retirement asset."

Burns also used the most recent joint tax return for husband and wife from 2020 and other "various business records of the company and other relevant forms and attachments to the tax return" in order to determine husband's gross income. Using the "adjusted cash flow method," Burns determined that when someone makes a "discretionary decision to take such a significant portion of [his] income [and] to put it in a retirement account that can be made by a business owner," then "that type of deduction should be considered as part of the overall income that would be available for support" because the "recipient of the spousal support also needs retirement income." Taking this "holistic view" of husband's income, Burns opined that husband's annual income was $900,000, or $75,000 a month based upon years 2018 to 2022.

Burns further explained that he sees the "intrinsic value" of a business "in the context of family law cases and business valuations" to be "the value of the economic benefit and returns and ownership interest that the holder of [the] interest receives by . . . holding that asset." Based upon his analysis, Burns also opined that the market value of investment capital for CBH overall was $11,000,070, with husband entitled to a 1/3 share of that valuation or approximately $3.5 million dollars. Burns concluded by explaining that his valuation of CBH was consistent with the valuations of similar companies found in multiple databases he researched and that, after his adjustments, he found the valuation of CBH "to be consistent" with industry margins.

Conversely, Raymond opined that there was a "material disconnect" between the $75,000 monthly income figure that Burns attributed to husband and the "actual cash" that husband received in the form of a salary. Raymond concluded that after removing the $271,535 that he testified that husband contributed to the plan each year on average from 2018 to 2022, husband only received $46,382 in gross monthly income which he testified should be adjusted to $31,696 net monthly income after state and federal taxes. Raymond also opined that Burns's valuation of husband's interest in CBH was "overstated by at least $1,300,000."

Raymond explained that when conducting a normalization adjustment to determine husband's salary, the object should be to "come up with what would it cost [CBH] in salary in compensation to hire somebody with comparable skills." Raymond testified that based on his qualitative valuation of the business, husband's "worth . . . to the business" was $979,524. He stated that changing Burns's $400,000 yearly salary figure to his $979,524 annual salary determination would change the valuation of the business from $3.5 million to $2.25 million, overstating the value of CBH by at least $1.3 million. When presented with reports of average salaries on cross-examination, Raymond conceded that his valuation of husband's salary was twice that of what those salaries reflected in the reports.

Blaser, CBH's certified public accountant who prepared the individual tax returns for husband and the other two members of CBH, testified that in 2020, CBH had received an IRS Form 1099 from LPL with a reported income of $3,698,216.69. Blaser then testified that he reported 100% of that figure as income to husband on the IRS Form 1040 he prepared for husband. Blaser then testified that when preparing husband's 2020 federal income tax return, he also prepared and attached a Schedule C to the husband's return which listed $3,093,862 in "expenses." He further testified that the expenses reflected on husband's Schedule C were Form 1099's reflecting non-employee compensation to the other two members of CBH. He then

explained that after subtracting the shared expenses of CBH from $3,698,216.69 and dividing the remaining balance by three, each of the partners' net income was $604,355 as reflected on the 2020 tax return he prepared for CBH. Regarding tax year 2021, Blaser testified that CBH received gross revenue from LPL of $4.356 million and that after subtracting shared expenses and the membership interest of the other members of CBH, husband would receive $746,036 in net income.

C. *Spousal Support: Wife's Income*

Wife testified that she was currently employed part-time as a pharmacist and part-time as a tutor. She also testified that the couple had enjoyed a high standard of living during their marriage and that as a result she was requesting $18,000 a month in spousal support. She also testified that one of their children has Type 1 diabetes and had been hospitalized twice. She further testified that their other two children also had unique difficulties, with one of the children displaying self-harming behaviors because of anxiety. Husband's expert witness in vocational assessment evaluated wife's "earning capacity and employability" as a pharmacist. He opined that wife's earning potential was $120,224 as a full-time pharmacist and that there were many postings for part-time and full-time jobs as a pharmacist in the Midlothian area.

D. *The Circuit Court's Final Order*

Husband and wife each submitted written closing statements. Wife maintained in her closing statement that Burns's valuation of CBH was correct and that the "most appropriate valuation date" for the retirement plan was December 31, 2022. She requested that the court award her the marital share of husband's one-third share of CBH, which, based upon husband's July 25, 2023 deposition testimony, was $1,300,000. She maintained that she should receive 50% of husband's share of the plan, which was $1,419,000 as of December 31, 2022, based upon the testimony of her expert witness.

Husband agreed in his closing statement that his interest in CBH was $1,300,000 but maintained that Burns's expert opinion concerning his monthly income was incorrect. Husband urged the circuit court to find that his expert, Raymond, was the more credible expert and to disregard Burns's expert report. Husband further criticized Burns's imputation of $30,000 income a month beyond husband's existing monthly salary as being "astronomical" and "unsustainable." He asserted that wife should only receive 50% of $813,712, which he alleged was his portion of the plan balance as of July 16, 2021.

Following review of the written closing statements, the circuit court entered an amended final decree on July 31, 2024, which incorporated its earlier rulings from August 28, 2023, and May 20, 2024. As a result, the circuit court found that husband's income was $75,000 a month and held that the value of husband's share in the plan was $1,419,000, with wife's marital share being $709,500 plus or minus gains or losses from December 31, 2022, until the date upon which the funds are transferred. The circuit court adopted Raymond's assessment of the value of CBH as being more accurate than Burns's valuation since Raymond's assessment of CBH included some measure of goodwill in the valuation of CBH and awarded wife her marital share of the husband's share in CBH. The circuit court further opined that after "consider[ing] the circumstances and factors which contributed to the dissolution of the marriage," wife had "a need for spousal support" and that husband had "the ability to pay spousal support." The court also noted that wife was seeking $18,000 a month in spousal support and did not dispute that she could work full-time. The court further noted that wife wanted to "remain home with the two children who are in high school, as she and the children were accustomed to during the marriage." The circuit court then declined to impute full-time income to wife "[g]iven the health issues of the children" and "in light of the recent 'cutting' episode" with one of the children.

Finally, the court ordered husband to pay $11,000 a month in spousal support to wife. Husband appealed.

## II. ANALYSIS

### A. *Standard of Review*

In rendering its equitable distribution ruling, a circuit court must 1) "classify the property," 2) "assign a value to the property," and 3) "distribute[] the property to the parties, taking into consideration the factors presented in Code § 20-107.3(E)." *Sobol v. Sobol*, 74 Va. App. 252, 273 (2022) (quoting *Fox v. Fox*, 61 Va. App. 185, 193 (2012)). "A trial court has broad discretion to determine the value of assets." *Hoebelheinrich v. Hoebelheinrich*, 43 Va. App. 543, 556 (2004). "[T]he particular method of valuing and the precise application of that method to the singular facts of the case must vary with the myriad situations that exist among married couples." *Howell v. Howell*, 31 Va. App. 332, 339 (2000). Because valuation is heavily fact-dependent, "we give great weight to the findings of the trial court." *Id.* "In sum, 'the value of property is an issue of fact, not law.'" *Hoebelheinrich*, 43 Va. App. at 557 (quoting *Howell*, 31 Va. App. at 340). The circuit court's factual findings will "not be set aside unless plainly wrong or without evidence to support it." *Payne v. Payne*, 77 Va. App. 570, 584 (2023) (quoting *Farley v. Farley*, 9 Va. App. 326, 328 (1990)). "We will reverse the trial court's award of equitable distribution only upon a showing of abuse of discretion." *Layman v. Layman*, 62 Va. App. 134, 137 (2013).

Similarly, "[t]he trial court has 'broad discretion in setting spousal support.'" *Wyatt v. Wyatt*, 70 Va. App. 716, 719 (2019) (quoting *Giraldi v. Giraldi*, 64 Va. App. 676, 681-82 (2015)). "When a court awards spousal support based upon due consideration of the factors enumerated in Code § 20-107.1, as shown by the evidence, its determination 'will not be disturbed except for a

clear abuse of discretion.'" *Chaney v. Karabaic-Chaney*, 71 Va. App. 431, 435 (2020) (quoting *Dodge v. Dodge*, 2 Va. App. 238, 246 (1986)).

"[O]nly 'when reasonable jurists could not differ can we say an abuse of discretion has occurred.'" *Brandau v. Brandau*, 52 Va. App. 632, 641 (2008) (quoting *Robbins v. Robbins*, 48 Va. App. 466, 482 (2006)). Therefore, the abuse of discretion standard "necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet still remain entirely reasonable." *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013).

B. *The circuit court did not err when determining the value of the plan for purposes of equitable distribution under Code § 20-107.3.*

Husband contends that the circuit court erred when determining that the marital share of the plan was $1,419,000. He specifically asserts 17 sub-assignments of error in support of his contention. Chiefly, he claims that the value of the marital share of the plan is incorrect because the circuit court erred: 1) by using the date of December 31, 2022, instead of the date of the parties' separation (July 16, 2021) in order to determine the marital share of the plan; 2) by finding that husband's contributions to the plan were voluntary and not mandatory because husband could not unilaterally decide the amount to contribute to the plan without his partners' consent; 3) by failing to find that husband's contributions to the plan were made on behalf of CBH, not by him individually; and 4) by failing to find that any qualified domestic relations order ("QDRO") that the circuit court attempted to enforce by order would violate ERISA and federal law. We disagree.

When tasked with equitably distributing the marital assets, "the trial court's job is a difficult one, and we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case." *Payne*, 77 Va. App. at 596 (quoting *Stark v. Dinarany*, 73 Va. App. 733, 750 (2021)).

- 13 -

> The court may direct payment of a percentage of the marital share
> of any pension, profit-sharing or deferred compensation plan, or
> retirement benefits, whether vested or nonvested, that constitutes
> marital property and whether payable in a lump sum or over a
> period of time. The court may order direct payment of such
> percentage of the marital share by direct assignment to a party
> from the employer trustee, plan administrator, or other holder of
> the benefits. However, the court shall only direct that payment be
> made as such benefits are payable. No such payment shall exceed
> 50 percent of the marital share of the cash benefits actually
> received by the party against whom such award is made. "Marital
> share" means that portion of the total interest, the right to which
> was earned during the marriage and before the last separation of
> the parties, if at such time or thereafter at least one of the parties
> intended that the separation be permanent.

Code § 20-107.3(G)(1).

Here, the circuit court's decision to use December 31, 2022, as the valuation date for the plan was not plainly wrong or without evidence to support it. The record, when viewed in the light most favorable to wife, reflects that it was the practice of CBH to actually fund the plan the next calendar year after it was determined what the minimum and maximum contributions were for the prior year. As noted in the record, the plan began in 2016 but was not funded until 2017. Also, Blaser stated that when CBH deposited funds in the plan in 2023, it was for the 2022 calendar year. Although the parties separated on July 16, 2021, the evidence supported the circuit court's conclusion that the plan was funded for 2021 in 2022. The record demonstrated that $500,000 of husband's $1 million loan from LPL, obtained in 2021 after the parties were separated, was used to fund the 2021 contributions to the plan. Thus, wife's right to the "portion of the total interest" that was "earned during the marriage" was best effectuated by using the later December 31, 2022 date rather than the earlier date of separation. The choice of the later date by the circuit court, given the unique facts and circumstances present here in determining what was earned during the marriage, was neither plainly wrong nor without evidence to support it.

Hence, the circuit court did not err by using a date other than the date of separation to determine the marital share of the plan.

In addition, the circuit court did not err when determining that husband occasionally made unilateral decisions regarding the amount of funds contributed to the plan. At trial, husband testified that all the loans from LPL were in his name, even going so far as to admit that he sometimes used the proceeds from the loans for a different purpose than what was represented to LPL when securing the loans. The circuit court also noted testimony confirming that husband was the contact person for Blaser, CBH's accountant, that husband handled the day-to-day operations of CBH, and had primary responsibility for the administration of the pension plan. The circuit court also found that based on the testimony at trial, husband was the "managing partner" of CBH as evidenced by several unilateral decisions made by husband, including decisions related to the pension plan and husband's status as the single individual with whom LPL had a contractual relationship.

Additionally, both expert-witness accountants in this case agreed that because husband did not take a salary from CBH, it was proper for the circuit court to "normalize" husband's salary. Furthermore, husband has not assigned error nor asserted that it was improper to assign a value to husband's salary as both an employee of CBH and as a partner of CBH. Hence, the circuit court was tasked with estimating both a salary and an ownership interest, using a unique business model, while attempting to "normalize" husband's income for purposes of spousal support and equitable distribution. When faced with this dilemma, the circuit court relied upon expert testimony in determining husband's normalized salary for purposes of deciding spousal support and equitable distribution. The record also demonstrates that the circuit court carefully evaluated the experts before finding Burns's opinion to be more accurate in some areas and Raymond's more accurate in others. Ultimately, the circuit court noted that Burns was the only

expert who provided their own independent evaluation, while Raymond repeatedly emphasized that his task was only to rebut Burns's evaluation, not to offer one of his own. Burns opined—repeatedly and without objection—that he valuated husband's contributions to the plan as coming from husband's "normalized" income as an employee and owner of CBH. This conclusion was further supported by husband's testimony that all the loans he procured from LPL were in his own name and that the plan was funded multiple times from these types of loans since the plan was first adopted in 2016. Therefore, when viewed while utilizing our deferential standard of review on appeal, we cannot say that the circuit court's findings concerning the contribution amounts attributed to husband were plainly wrong or without evidence to support them. The circuit court's credibility determinations of the expert witnesses before it—and all other witnesses as well for that matter—may not be second-guessed on appeal. *See Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 423 (2012) ("We are not permitted to conduct a trial *de novo* on appeal to second guess a trial court's credibility determination.").

Husband further argues that the circuit court would not be able to effectuate its order via a QDRO because any QDRO would violate ERISA by "arbitrarily increasing [h]usband's plan benefit beyond its actuarial value." He argues that husband's share of the plan as of December 31, 2022, was $1,088,000, not the $1,419,000 as opined by Burns.

Virginia law establishes that "awards may be decreed prior to the pensioner's receipt of payments even though future payments may be 'an expectancy.'" *Cook v. Cook*, 18 Va. App. 726, 729 (1994). Here, the circuit court found that the marital share of the plan was $1,419,000 and that wife would receive 50% of that amount, or $709,500. Crucially, the circuit court's final order noted that husband was to prepare a QDRO for entry within 90 days of the final order and that if "the QDRO is not approved by the Plan Administrator . . . this issue is reserved to this

Court for determination including a determination on how and when the funds owed to Wife from Husband for his interest in the [plan] will be paid to Wife."

Nothing in the circuit court's order renders ordering a QDRO a violation of ERISA or, for that matter, any other federal regulations or cases cited by husband. "The court may direct payment of a percentage of the marital share of any pension, . . . whether *vested or nonvested*, which constitutes marital property and whether payable in a lump sum or over a period of time. However, *the court shall only direct that payment be made as such benefits are payable*." *Cook*, 18 Va. App. at 728 (alteration in original) (quoting Code § 20-107.3(G)). The $331,000 portion of husband's share of the plan that was determined by the circuit court to be voluntarily overfunded into the plan by husband does not have to be vested for the circuit court to order it to be transferred by QDRO to wife. *See id.* And the requirements of ERISA are not in conflict with Virginia law because payments to wife from the plan will only "*be made as such benefits are payable.*" *Id.* Furthermore, there is no indication in the record or in husband's brief that a QDRO has been sought, let alone that one was rejected by the plan administrator. And there is no evidence in the record as to what the terms of the QDRO would be and what the transfer schedule would look like. Additionally, the circuit court explicitly reserved the determination of any issue relating to the effectuation of the QDRO if the plan administrator fails to implement a QDRO consistent with the circuit court's final order. Thus, the circuit court did not "arbitrarily" increase husband's value in the plan and the circuit court did not err in determining the value of husband's cash balance pension plan for purposes of equitable distribution under Code § 20-107.3.

C. *The circuit court did not err in finding that husband's income was $75,000 a month for purposes of determining child and spousal support under Code § 20-107.1.*

Husband further contends that the circuit court erred in finding that his monthly income was $75,000. In support, he asserts 11 sub-assignments of error.[6] Primarily, he argues that the circuit court erred: 1) by adopting the expert opinion of wife's expert rather than husband's expert; 2) by "seem[ing] to indicate" that it "was required to adopt" one of the experts' opinions; and 3) by "double counting" husband's contributions to the plan when determining the market value of CBH and when determining his income. We disagree.

When determining spousal support, courts "shall consider the circumstances and factors which contributed to the dissolution of the marriage, specifically including adultery and any other ground for divorce." Code § 20-107.1. In addition, courts are to consider the other factors included in Code § 20-107.1, such as the needs and financial resources of the parties, the standard of living during the marriage, the characteristics of the children of the parties that would affect employment outside the home, and each party's earning capacity. *Id.*

Here, husband asks us to reverse the decision of the circuit court based upon the court's reliance on wife's expert. Instead, he requests that we find that the valuation by his expert should have been adopted. The record before us established that husband frequently overfunded the plan. Husband could have chosen to take this money as income, utilized the money to increase CBH's value, or he could have re-invested it in the business. Instead, he chose to overfund the CBPP. As noted above, the circuit court had a range of choices when faced with how to characterize husband's use of large loans from LPL secured in his own name that he used

---

[6] Husband likewise asserts sub-assignments of error that relate to errors of the circuit court in "ignoring federal law" as well as "disregarding testimony" that the partners of CBH made all their decisions together and did not act unilaterally in making business decisions. As issues of valuation of the plan are intertwined with those relating to husband's income, these arguments are addressed in the discussion of husband's first assignment of error.

to fund the CBPP. Husband's use of the loans in his own name was, in part, because of the unique business relationship between LPL, CBH, and the other individuals owning and working at CBH. The record demonstrates that husband did not have a traditional job where he took a salary from the business. Instead, he would attribute certain expenses to the business and use other funds from other income streams for personal expenses. Therefore, for purposes of determining spousal support, both Burns and Raymond determined that it was necessary to "normalize" husband's salary to determine what his income would be as an employee *and* what his income would be from his ownership interest in CBH. We find, that in making this factual determination as to husband's normalized salary, the circuit court's finding was not plainly wrong or without evidence to support it.

Inexplicably, husband urges this court to rely on his expert's testimony while also decrying the circuit court's apparent indication that it was "required" to adopt one of the experts' opinions. At trial, the circuit court asked husband's counsel if the court was required to agree with Burns, who opined that all the contributions to the plan were income, or Raymond, who opined that none of the contributions to the plan were income. In response, husband's counsel only stated that the circuit court had already given wife her share of the existing balance of the plan, to be paid to her under a QDRO, but that it was error to consider any money placed in the plan as part of husband's income going forward. In any event, the circuit court evaluated all the evidence adduced at trial and found Burns's testimony to be more credible in some instances and less credible than husband's expert in others. *See Farrell*, 59 Va. App. at 423. Thus, the record belies husband's contention that the circuit court impermissibly relied solely on one expert rather than independently reaching its conclusions on the matter before it.

Finally, the circuit court awarded wife the marital share of the plan as of December 31, 2022. Wife's spousal support award—which is based upon husband's $75,000 monthly

income—began on July 17, 2023. Even considering that the pension plan is funded one calendar year after the contributions become due, this still gives ample time for husband, in light of the circuit court's factual determination, to make any desired adjustments to the amount that husband has been overfunding the plan. Because wife will no longer receive any portion of the plan beyond the date the circuit court ordered, husband's normalized income for purposes of spousal support will not result in "double counting" any of husband's income or awarding wife an improper windfall. Accordingly, the circuit court's finding that husband's income is $75,000 a month is not plainly wrong or without evidence to support it.

D. *The circuit court did not err in determining the amount of wife's spousal support under Code § 20-107.1.*

Husband also avers that the circuit court erred in fixing the amount of his spousal support payment to wife at $11,000 a month. In support, he asserts 9 sub-assignments of error. Principally, he contends that the circuit court erred: 1) by failing to impute a full-time salary to wife; 2) by disregarding the testimony of husband's vocational expert; 3) by awarding $11,000 per month to wife in spousal support when wife's "need for spousal support was $9,000"; 4) by failing to find that wife's need was "much less" than $9,000 a month; and 5) by imputing income to wife for child support purposes but not for spousal support.[7] We disagree.

"In setting or modifying spousal support or child support, a court may impute income to a party voluntarily unemployed or underemployed." *Blackburn v. Michael*, 30 Va. App. 95, 102 (1999). However, Virginia law does not require that "a stay-at-home spouse capable of working must go to work immediately after the divorce trial or face a judicially imposed imputation of income." *Brandau*, 52 Va. App. at 640.

---

[7] Husband also reasserts arguments relating to testimony in the record that the partners of CBH made all their decisions together and did not act unilaterally in making business decisions, as well as arguments regarding husband's income. These arguments have already been addressed above.

- 20 -

Husband contends that wife was capable of earning an annual full-time salary of at least $120,000.[8] However, the circuit court, applying the factors in Code § 20-107.1, specifically gave weight to the standard of living that was established during the marriage, as well as the circumstances leading up to the dissolution of the marriage, including the inference of adultery that was drawn from husband's invocation of his Fifth Amendment right against self-incrimination. *See* Code § 8.01-223.1. Wife also testified that her new hourly rate as a pharmacist would be $62 an hour, resulting in an annual income of $128,960 if she was employed full-time. But the circuit court concluded that wife's imputed income was only $21,909.68 annually. In doing so, it found that there were unique needs of their children that wife was able to assist with, including taking the children to school and taking care of some of the children's health issues. Additionally, the circuit court noted that the nature of wife's job as a pharmacist meant that if she was working, she would not be able to readily leave her job and take care of any medical needs of her children. All these factual determinations made by the circuit court are entitled to deference on appeal and are consistent with the circuit court weighing the factors under Code § 20-107.1, including the requirement to weigh "the extent to which the age, physical or mental condition or special circumstances of any child of the parties would make it appropriate that a party not seek employment outside of the home."[9]

Husband also claims that wife's need for spousal support was only $9,000 a month and further that the circuit court should have found that her need was much less. However, the

___

[8] Once again, husband asks us to overturn the circuit court's credibility determination of an expert witness, arguing that it should have accepted his vocational expert's opinion that wife was able to work full-time as a pharmacist. We again decline to do so. *See Farrell*, 59 Va. App. at 423.

[9] Husband argues that there was no evidence presented that one of the children was harming herself. But even if this were true, there was still evidence of medical needs of the other children and the custom of the parties that wife primarily stayed at home with the children.

circuit court explicitly stated that it was not only considering wife's stated need but also "all of the factors" in the statute, which included the standard of living during the marriage, husband's earning capacity, and the circumstances that contributed to the dissolution of the marriage. Accordingly, the circuit court's factual determination is not plainly wrong or without evidence to support it; thus, we will not disturb it on appeal.[10]

E. *We decline to award appellate attorney fees to either party.*

Husband and wife ask this court to award them their respective appellate attorney fees. After consideration, we exercise our discretion and decline to do so. Rule 5A:30.

### III. CONCLUSION

The circuit court considered all the evidence presented at trial and adopted factual conclusions that are supported by the record before us on appeal. Therefore, under our standard of review for matters of spousal support and equitable distribution, we affirm.

*Affirmed.*

---

[10] Husband also argues that the circuit court erred in attributing income to wife for purposes of child support but not spousal support. The record does not support this contention. Husband seemingly is addressing the circuit court's August 28, 2023 order in which it stated that "the Court will use [wife's] actual income for 2022 of $21,909.68, or $1,826.00 per month. For child support purposes," and continues. But when read in conjunction with the circuit court's amended final decree entered July 31, 2024, the final decree lists "Permanent Spousal Support Award to Wife" at the top of the page and then states that "[w]ife's gross income based upon her 2022 income is $21,909.68 per year or $1,826.00 a month." Accordingly, the circuit court did not impute income to wife just for child support but also for spousal support.